**This order is SIGNED.**


**Dated: August 24, 2022**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

kw

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>GEOFFREY WAYNE MYERS,<br>Debtor. | Bankruptcy Number: 19-20645<br><br>Chapter 7 |
| RICHARD BAER<br>Plaintiff,<br><br>vs.<br><br>GEOFFREY WAYNE MYERS,<br>Defendant. | Adversary Proceeding No. 19-02054<br><br>Hon. Kevin R. Anderson |

**MEMORANDUM DECISION DENYING PLAINTIFF'S
CAUSES OF ACTION UNDER 11 U.S.C. § 523(a)(2)**

Friendship ends where money begins. Between 2011 and 2015, Debtor Geoffrey Wayne Myers ("Debtor") operated two businesses with his partner and close friend, Plaintiff Richard Baer ("Baer"). One business involved financial planning, in which the Debtor had previous experience; the other business was an assisted living center, in which the Debtor had no experience. Baer funded the business ventures while the Debtor handled day-to-day management. As a friend, Baer also made personal loans to the Debtor to assist him during familial difficulties. However, the parties' relationship substantially soured after Baer accused the Debtor of mismanaging and stealing from the living center business, which resulted in Baer firing the Debtor.

Four years after his termination, the Debtor filed for bankruptcy followed by Baer filing

this nondischargeability complaint under 11 U.S.C. § 523(a)(2). For the reasons set forth below,

the Court finds that on the petition date, the monetary claims arising from the living center business

were unenforceable under Utah law, thus depriving Baer of a justiciable claim for

nondischargeability. The Court further finds that Baer has not established by a preponderance of

the evidence the required elements to prevail under § 523(a)(2) as to his prior loans to the Debtor.

## I.    JURISDICTION AND VENUE

The Court's jurisdiction over this adversary proceeding is properly invoked under 28

U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) because the complaint

seeks a determination as to the dischargeability of particular debts. Venue is appropriately laid in

this District under 28 U.S.C. § 1409(a). In their Pretrial Order, the parties consented to entry of a

final judgment or order by this Bankruptcy Court.[1]

## II.    PROCEDURAL BACKGROUND

On February 4, 2019, the Debtor filed the above-captioned voluntary Chapter 7 bankruptcy

petition. On May 13, 2019, Baer timely filed this adversary proceeding against the Debtor seeking

a determination of nondischargeability under § 523(a)(2). The Debtor initially proceeded *pro se*,

which resulted in a number of procedural *faux pas* as detailed in the docket. The Debtor ultimately

retained competent counsel, and the Court conducted the trial on April 20-21, 2022, and May 4,

2022. Paul H. Gosnell appeared for Baer, and Steven M. Rogers appeared for the Debtor. At the

conclusion of the trial on May 4, 2022, the Court took the matter under advisement.

---

[1] ECF No. 55.

Having carefully considered the parties' oral and written arguments, the evidence and testimony elicited at trial, and having conducted its own independent research of the relevant case law, the Court issues the following Memorandum Decision.[2]

## III.    FACTS

### A.    The Parties Meet and Start a Financial Planning Business.

Plaintiff Richard Baer is a psychologist in Cache County, Utah,[3] and the Debtor/Defendant is Geoffrey Wayne Myers. In 2009, Baer and Myers met at a financial seminar in Logan, Utah, where they developed a business relationship.[4] The Debtor represented to Baer that prior to his move to Logan, he operated a successful financial planning business in Las Vegas.[5] Impressed by the Debtor's skill at managing one of Baer's mutual funds, Baer hired the Debtor as his new financial planner.[6] The parties' relationship ultimately developed into a close friendship.[7]

In 2011, the Debtor approached Baer about funding his new financial planning business, Perpetual Wealth, in Logan, Utah.[8] As proof of his business abilities, the Debtor provided Baer a 2008 profit and loss statement generated by Quickbooks showing $250,000 in net income from his former financial planning business in Las Vegas (the "Quickbooks Statement").[9] Baer agreed to provide $150,000 in loans to the business with the Debtor to run it and make it successful.[10] In

---

[2] This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052. Any of the findings of fact here are deemed, to the extent appropriate, to be conclusions of law, and any of the conclusions of law here are similarly deemed to be findings of fact, and they shall be equally binding as both.

[3] Notice of Statement of Stipulated Facts at 2, No. 19-02054, ECF No. 51. Unless otherwise stated, all subsequent ECF citations refer to Adversary Case No. 19-02054

[4] Trial Audio at 52:46, ECF No. 63.

[5] ECF No. 51 at 2; Trial Audio at 56:58, ECF No. 63.

[6] *Id.*

[7] *Id.*

[8] Docket 51 at 2; Trial Audio at 59:53 at ECF No. 63.

[9] ECF No. 51 at 2; Trial Audio at 4:47:27, ECF No. 63.

[10] *Id.*

exchange, the parties would share in the profits, with Baer receiving 20% and the Debtor 80%.[11]

Between 2011 and 2013, Baer and the Debtor would meet periodically to discuss both the business

and Baer's personal investment portfolio.[12] The Debtor used the investment money on what

appeared to be legitimate business needs such as attending seminars and renting an office.[13]

However, by 2012 the Debtor had spent Baer's $150,000 investment, yet Perpetual Wealth was

not prospering.[14] The Debtor cited poor market conditions and family challenges involving his

new wife and their large, blended family as the contributing factors to the lack of financial

success.[15]

That same year, the Debtor shifted from Perpetual Wealth to a job at Merrill Lynch in order

to cover his expenses, including a domestic support obligation to his former spouse.[16] Baer,

unhappy with Perpetual Wealth's lack of success, continued to ask for the return on his

investment.[17] After a year at Merrill Lynch, and at his wife's insistence, the Debtor moved to

Washington state in 2013, where he relaunched Perpetual Wealth under the new name of Myers

Financial.[18] Even after no return on his investments in Perpetual Wealth/Myers Financial, Baer

continued to make business and personal loans to the Debtor.[19] At trial, Baer testified that he did

not push to collect the loans because of the Debtor's reassurances that Myers Financial needed

---

[11] *Id.*

[12] Trial Audio at 1:03:54, ECF No. 63.

[13] *Id.*

[14] Trial Audio at 1:04:34, 1:06:41, ECF No 63; Trial Audio at 3:11:25, ECF No. 64.

[15] Trial Audio at 1:07:00, ECF No. 63; Trial Audio at 3:11:25, ECF No. 64.

[16] Trial Audio at 3:12:16, ECF No. 64.

[17] *Id.*

[18] ECF No. 51; Trial Audio at 1:03:24, ECF No. 63; Trial Audio at 3:16:52, ECF No. 64.

[19] Trial Audio at 1:07:23, ECF No. 63.

time to grow.[20] Baer testified that he trusted the Debtor based on their friendship and the Debtor's

perceived sincerity.[21]

### B.    The Parties Embark on the Pioneer Street Business Venture.

While living in Washington state, the Debtor met Mary Bodine who was looking to sell

her businesses.[22] The businesses consisted of an assisted living center for mental health patients,

a cab company to transport patients, and a limited liability company holding business assets

(collectively "Pioneer Street").[23] The Debtor approached Baer about funding the acquisition of

Pioneer Street with the Debtor to manage it. Baer ultimately agreed to again joint venture with the

Debtor to acquire and operate the Pioneer Street businesses.[24]

To fund the purchase of Pioneer Street, Baer contributed $500,000 of his own money and

borrowed another $2 million.[25] Although the Debtor believed Baer would give him an ownership

interest in Pioneer Street, Baer declined because he shouldering all of the financial risk. But Baer

did agree to share Pioneer Street profits fifty-fifty with the Debtor.[26] The parties never

memorialized their agreements regarding Pioneer Street.

### C.    The Debtor Signs Notes to Repay Loans from Baer.

After Pioneer Street launched, the Debtor ended his work with Perpetual Wealth and Myers

Financial to focus on Pioneer Street.[27] In connection with winding down the financial planning

businesses, the Debtor signed two promissory notes on June 1, 2014, to repay Baer for his loans

---

[20] Trial Audio at 1:03:24, ECF No. 64.

[21] Trial Audio at 09:10, ECF No. 64.

[22] ECF No. 51 at 3. The entities were named Pioneer Street, LLC; Pioneer Street Cab, LLC; and Pioneer Street Properties, LLC.

[23] *Id.*

[24] *Id.*

[25] Trial Audio at 1:23:05, ECF no. 63.

[26] Trial Audio at 1:24:10, ECF No. 63; Trial Audio at 3:27:38, 4:12:22, 5:02:55, ECF No. 64.

[27] Trial Audio at 3:33:23, ECF No. 64.

relating to these businesses (the "2014 Notes"). The 2014 Notes were in the respective amounts of $173,877 and $67,665.[28] Both notes indicated that they were signed for "business purpose[s]," but they also state that they "replace[] any and all prior notes between the parties."[29] At trial, Baer and the Debtor agreed that the 2014 Notes covered a combination of business loans for Perpetual Wealth and Myers Financial, as well as personal loans to the Debtor.[30] The parties previously memorialized some of these loans in other notes prior to the 2014 Notes, which the Debtor asserts he repaid.[31] The exact amount of Baer's loans for personal versus business use is uncertain.[32] On the 2014 Notes, the Debtor made ten monthly payments from July 2014 through April 2015 (the month Baer fired him), for a total repayment of $17,294.86.[33]

Sometime in 2013 or 2014, and prior to signing the 2014 Notes and the Pioneer Street venture, the Debtor disclosed to Baer in a casual conversation that he had filed for bankruptcy in 2010.[34] The Debtor testified that his first divorce left him with sole responsibility for $1 million in community property debts after his ex-wife's bankruptcy filing. This, coupled with his divorce support obligations and his move to Utah, caused him to file his own bankruptcy case in 2010.[35] The Debtor did not perceive a duty to disclose the 2010 bankruptcy earlier in his relationship with Baer.[36] After its disclosure, Baer did not ask any questions or further investigate the details of the Debtor's bankruptcy filing.[37] While Baer testified that this information altered his willingness to

---

[28] Pl's Exs. A and C.

[29] *Id.*

[30] ECF No. 51; Trial Audio at 1:08:07, 2:29:46, ECF No. 63.

[31] Trial Audio at 1:11:37, 2:28:23, ECF No. 63.

[32] *Id.*

[33] Pl's Exs. B, D.

[34] Trial Audio at 1:01:07, ECF No. 63.

[35] Trial Audio at 3:01:02, ECF No. 64.

[36] Trial Audio at 4:52:20, ECF No. 64.

[37] Trial Audio at 13:30, ECF no. 64.

make additional personal loans to the Debtor, the facts establish that it did not alter his willingness to launch Pioneer Street with the Debtor or to authorize additional, personal loans to the Debtor from the Pioneer Street business.[38]

### D.      The Pioneer Street Business Venture.

Baer and the Debtor operated Pioneer Street together from June 2014 through April 2015.[39] As manager of the business and its bank accounts, the Debtor was under direction from Baer that any profit checks must be issued to each party in equal amounts.[40] The Debtor was also restricted from taking out personal loans from Pioneer Street unless there were sufficient profits to fund such loans.[41] Baer testified that beginning in July 2014, the Debtor began sending him monthly profit checks of $9,000.[42] Baer further testified that the Debtor began to take out personal loans from Pioneer Street, including loans to care for one of his children.[43] Because the profit checks came in regularly for the next several months, and because the Debtor was making regular payments on the 2014 Notes, Baer thought that Pioneer Street was successful and generating the anticipated profits.[44]

### E.      The Debtor Struggles with Managing Pioneer Street.

In reality, Pioneer Street was having financial problems. At trial, the Debtor testified that because Pioneer Street generated income through Medicare, Medicaid, and subsidies, most income from these sources would not be received until some months after the services were rendered.[45]

---

[38] Trial Audio at 2:26:43, ECF No. 63.

[39] Trial Audio at 3:29:55, 5:02:07, ECF No. 64; Trial Audio at 2:01:47, ECF No. 63.

[40] Trial Audio at 1:24:10, 2:02:52, ECF No. 63.

[41] Trial Audio at 1:27:59, ECF No. 63.

[42] *Id.*

[43] Trial Audio at 2:04:52, ECF No. 64; Pl's Ex. G at Baer37.

[44] Trial Audio at 1:26:15, ECF No. 63; Pl's Exs. B, D.

[45] Trial Audio at 3:37:33, ECF No. 64.

Thus, the first two or three months of income from these sources went to Mary Bodine for the services she provided prior to the sale of the business.[46] As a result, the Debtor relied on two $50,000 lines of credit, for which Baer was personally liable, to cover monthly expenses.[47] After that initial period, the Debtor testified that he thought it appropriate to issue $9,000 profit checks to him and Baer because "the books said [the money] was there."[48] In reality, the money on the Pioneer Street accounts was due in large part to draws on the lines of credit and not from profits.

Specifically, the Debtor initiated several draws that essentially drained the two lines of credit. From the Pioneer Street LLC line, the Debtor drew $20,000 on November 4, 2014; $20,000 on December 30, 2014; and $9,800 on February 10, 2015, totaling $49,800 in advances.[49] Likewise, from the Pioneer Street Cab LLC line, the Debtor drew $20,000 on November 4, 2014; $15,000 on December 9, 2014; and $14,000 on February 10, 2015.[50]

However, the Debtor also testified that the Pioneer Street books confused him because the accounting changed to a "cash basis from an accrual basis."[51] The Debtor alleged that he only issued the profit distributions to him and Baer when he saw sufficient cash in the operating account. He also stated that Baer reviewed and signed the profit checks.[52] His alleged financial planning savvy aside, the Debtor nonetheless asserted he had no experience in accounting, so he did not realize that the supposed profits on the books were coming from draws on the credit lines.[53]

---

[46] *Id.*

[47] *Id.*; Pl's Exs. E at Baer13 and F at Baer23.

[48] Trial Audio at 3:42:50, ECF No. 63.

[49] Pl's Ex. E at Baer13–Baer14.

[50] Pl's Ex. F at Baer23–Baer24.

[51] Trial Audio at 3:43:47, ECF No. 64.

[52] *Id.*

[53] *Id.*

### F.    Baer Hires a Business Coach at the Debtor's Request.

In March 2015, after the Debtor's final draw on the lines of credit, the Debtor asked Baer to hire an individual named Gary Furr as a business coach.[54] The Debtor and Furr had previously met at a networking event in 2014.[55] Baer initially hesitated to hire Furr, feeling confused about the Debtor's need for coaching considering his alleged business skills.[56] Baer eventually capitulated and allowed Furr to aid the Debtor.[57]

When Furr began coaching the Debtor in March 2015, he learned that the Debtor did not have an ownership interest in Pioneer Street, as the Debtor had initially claimed, and that Baer was the one funding Pioneer Street.[58] Furr found the Debtor to be a poor student who failed to follow through with specific coaching assignments.[59] Once Furr reviewed Pioneer's finances, he noticed multiple transactions that he perceived as problematic, including the draws on the lines of credit, purchases by the Debtor at Costco on Christmas Eve, Rose Bowl tickets, gasoline for trips to California, detailing expenses for the Debtor's BMW car, etc.[60] Furr found no receipts, leaving him unable to verify the specifics of questionable transactions.[61] Around the same time, Baer received a troubling phone call from a Pioneer Street employee, leaving him with the impression that the Debtor was doing a poor job of managing Pioneer Street.[62] Concerned, Baer drove to Washington in April 2015 to address the potential problems reported by Furr and the employee.[63]

---

[54] Trial Audio at 1:32:07, ECF No. 63.

[55] Trial Audio at 51:08, ECF No. 64.

[56] Trial Audio at 1:32:17, 3:17:55, ECF No. 63.

[57] Trial Audio at 3:17:55, ECF No. 63.

[58] Trial Audio at 54:26, ECF No. 64.

[59] *Id.*

[60] Trial Audio at 55:33, ECF No. 64.

[61] Trial Audio at 1:41:16, ECF No. 64.

[62] Trial Audio at 1:28:33, ECF No. 63.

[63] Trial Audio at 1:34:51, ECF No. 63.

### G.    The Debtor is Fired Based on Allegations of Fraud.

Arriving in Washington, Baer and Furr reviewed the Pioneer Street books and records.[64] Furr presented a spreadsheet of the Debtor's allegedly duplicitous transactions[65] and expressed his suspicion of the fraud.[66] Baer and Furr then met with the Debtor around the end of April 2015, and confronted him with these concerns.[67] When the Debtor was unable to adequately explain the books and records and questionable expenses, Baer fired him as manager of Pioneer Street.[68] Baer then hired Gary Furr to work for Pioneer Street.[69]

In May 2015, Baer, Furr, and the Debtor met again, this time with Pioneer Street's legal counsel, Scott Phillips.[70] Attorney Phillips prepared and presented to the Debtor three documents: (1) a settlement agreement outlining the parties' disputes and resolutions; (2) a promissory note for $55,660.46 payable from the Debtor to Pioneer Street ("the Settlement Note"); and (3) a Confession of Judgment in like amount (collectively the "Settlement Documents").[71] The dollar amount in the Settlement Documents was based on the Debtor's alleged fraudulent transactions with Pioneer Street along with $5,000 in personal loans the Debtor owed to Baer.[72]

At trial, Baer and Furr testified that the Debtor admitted to some inappropriate expenses and agreed to sign the Settlement Documents.[73] However, the Debtor testified that he felt

---

[64] Trial Audio at 1:32:47, ECF No. 63; Trial Audio at 56:06, ECF No. 64.

[65] Ex. G.

[66] Trial Audio at 1:38:28, ECF No. 63; Trial Audio at 1:01:10, 1:48:49, ECF No. 64.

[67] Trial Audio at 1:36:20, 2:03:25, ECF No. 63.

[68] *Id.*

[69] Trial Audio at 52:41, ECF No. 64.

[70] Pl's Ex. K at Baer 58; Trial Audio at 1:39:41, 3:10:47, ECF No. 63; Trial Audio at 1:19:11, 4:07:38, ECF No. 64.

[71] Pl's Ex. H; Trial Audio at 28:53, ECF No. 64.

[72] Pl's Exs. H and G; Trial Audio at 2:04:08, ECF No. 64.

[73] Trial Audio at 1:38:49 ECF No. 63; Trial Audio at 1:18:58, ECF No. 64.

emotional over the accusations and left the meeting without signing, admitting, or agreeing to anything.[74]

### H.    The Parties Post-Employment Communications.

In later email correspondence, Baer explained to the Debtor that he was fired due to alleged theft from the business.[75] The Debtor did not admit to either fraud or theft in the emails, but merely requested more information about the alleged fraudulent transactions.[76]

Between May 2015 and April 2016, the Debtor continued to have email correspondence with Baer and Attorney Phillips.[77] Attorney Phillips emailed the Settlement Documents to the Debtor for signature.[78] The Debtor stated via email that he had notarized the "promissory notes" and returned them.[79] At trial, the Debtor testified that he was referring to the 2014 Notes, rather than the Settlement Note for $55,660.46.[80] Conversely, Baer testified at trial his belief that the Debtor was referring to the Settlement Note.[81] Baer does not have a copy of the Settlement Note with the Debtor's signature, and the Court concludes that the Debtor never signed it.[82]

Around this same time, the Debtor expressed in an email to Baer his remorse for some of his actions. The Debtor stated his desire "to be the hero" and "to give anything and everything" to his family and friends, even if that meant "borrowing enough money to keep our standard of living far better than it should have been."[83] The Debtor admitted, "I know I am an honest man, but yet,

---

[74] Trial Audio at 3:52:18, ECF No. 64.

[75] Pl's Ex. I, Baer52.

[76] *Id.* at Baer53.

[77] Trial Audio at 4:04:01, ECF No. 64; Pl's Exs. I, J, K.

[78] Pl's Ex. K at Baer59.

[79] *Id.*

[80] Trial Audio at 4:24:46, ECF No. 64.

[81] Trial Audio at 1:47:40, ECF No. 63; Pl's Ex. K at Baer59.

[82] Trial Audio at 2:27:20, ECF No. 63; 4:17:04 ECF No. 64.

[83] Pl's Ex. J at Baer55.

I haven't been."[84] He lamented that his "best prospect for handling [his] debts was being in business with [Baer], yet [he] let [his] own arrogance, fear, ignorance and greed destroy that as well."[85] The Debtor further admitted:

> I look back and see that most of the deals I had made with you were made from fear. I was afraid of failing again at marriage and at business. It was easier to borrow money to pay the bills and stay home to work on the marriage, or so it seemed. My stated intention was always to borrow the money to build the business, which would allow me to stay home. Somewhere along the way, it turned into borrowing so I could stay home. In the end, I barely have a marriage, I have no money, and I have lost every other important relationship outside of family, and I stand to lose much more.[86]

The Debtor testified at trial that this email was not an admission of fraud but of his personal failings to family, friends, and the businesses.[87]

## I.    The Bankruptcy Filing and the Adversary Proceeding.

After being fired in April 2015, the Debtor made no further payments on the 2014 Notes.[88] The Debtor also never made any payments on the Settlement Note, and the parties ceased contact after June 2016.[89] The Debtor filed his Chapter 7 bankruptcy petition on February 4, 2019. On May 13, 2019, Baer filed this adversary proceeding against the Debtor seeking a denial of discharge under § 523(a)(2) as to the 2014 Notes, the Settlement Note, and/or damages for fraud arising from the Pioneer Street venture.[90] The complaint sought a nondischargeable judgment in the amount of $292,202.46.

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] Trial Audio at 4:32:56, ECF No. 64.

[88] Pl's Exs. B and D.

[89] Trial Audio at 4:13:34, ECF No. 64.

[90] Case No. 19-02054, ECF No. 1.

## IV.    ANALYSIS

Baer's complaint, filed by his prior attorney, contains general allegations of the following allegedly fraudulent representations: (1) the Debtor was a successful financial planner; (2) Baer's loans to the Debtor would be used to pay business expenses; and (3) Pioneer Street was profitable. The complaint then seeks a determination of nondischargeability under § 523(a)(2) as to the 2014 Notes and the Settlement Note. The complaint does not distinguish between the general fraud of § 523(a)(2)(A) and a materially false written statement respecting the Debtor's financial condition under § 523(a)(2)(B).

At trial, Baer focused on the following alleged frauds in connection with the 2014 Notes: (1) the nondisclosure of the Debtor's 2010 bankruptcy filing; and (2) the materially false Quickbooks Statement showing a profit of $250,000. As to the Settlement Note, Baer alleged the following: (1) the Debtor fraudulently represented that Pioneer Street was profitable and thereby wrongfully received profit distributions and personal loans; (2) the Debtor fraudulently paid for personal expenses out of Pioneer Street funds; and (3) the Debtor continued the fraud by representing he would sign the Settlement Note when he had no intention of doing so.

In response, the Debtor argued that on the petition date, the Settlement Note was unenforceable because the Debtor never signed it, and that any fraud action arising from the Pioneer Street business was barred by Utah's statute of limitations. As to both the 2014 Notes and the Settlement Note, the Debtor argued that Baer failed to establish by a preponderance of the evidence that the Debtor acted with a fraudulent intent, and that Baer's reliance on the Debtor's representations was neither justifiable nor reasonable.

Nondischargeability actions require the Court to assess the credibility of the parties. The Court carefully observed the demeanor of the witnesses while looking for inconsistencies in the

testimony, unlikely narratives, and contradictions with the documentary evidence. The Court found Baer's testimony to be consistently credible in all respects. However, given the circumstances of this case, Baer's testimony alone is not sufficient to establish that the Debtor made false oral or written statements or had a fraudulent intent. These allegations require more conclusive documentary and/or circumstantial evidence.

As to the Debtor's testimony, the Court found it to be generally credible except as to some of his explanations regarding the Pioneer Street venture. For example, the Court was incredulous as to the Debtor's assertions that he did not understand that loan proceeds from the Pioneer Street lines of credit equated to business earnings that merited profit distributions to Baer and the Debtor and that justified borrowing money from Pioneer Street. The Court also questioned the Debtor's testimony regarding the email on March 29, 2016, wherein he states that he had notarize and mailed to Attorney Phillips "the promissory notes you had prepared a while ago."[91] At trial, the Debtor testified that this email related to the 2014 Notes and not the Settlement Note. This testimony is inconsistent with the entire email string wherein Attorney Phillips and Baer are referencing the Settlement Documents and asking the Debtor to sign and return them.[92] The Court therefore finds it more likely than not that the Debtor mislead Baer and Attorney Phillips into believing he would or had signed the Settlement Note when he had not. However, the Debtor's lack of credibility on these points does not alter the Court's ruling below as to the Pioneer Street debts.

### A.    On the Petition Date, Were the Pioneer Street Debts Unenforceable Under Utah Law?

The Debtor asserts that Baer has no cause of action under § 523(a)(2) for the $55,660.64 in claims arising from the Pioneer Street venture, as memorialized in the unsigned Settlement

---

[91] Pl's Ex. K at Baer59.

[92] Pl's Exs. J-L.

Note[93] and Furr's list of alleged fraudulent expenses.[94] Specifically, the Debtor asserts these debts are unenforceable because (1) the Debtor never signed the Settlement Note; and (2) the claim for fraud arising from the Pioneer Street business is barred by Utah's statute of limitations.

The Tenth Circuit recognizes that a cause of action under § 523 consists of two components: (1) the establishment of an allowable claim in bankruptcy; and (2) the establishment that such claim is nondischargeable.[95] "[T]he establishment of the debt itself, is governed by the state statute of limitations—if suit is not brought within the time period allotted under state law, the debt cannot be established."[96] Thus, a failure to establish the former moots the latter: "Where there is no claim under state law, there is no debt subject to discharge, and, ergo, no justiciable claim for non-dischargeability."[97]

In general, an allowable claim in bankruptcy is one that as of the petition date is legally enforceable against the debtor based on an agreement or applicable law.[98] Thus, a prerequisite to determining the nondischargeability of the Pioneer Street debts is whether they were legally enforceable against the Debtor as of the petition date.

---

[93] Pl's Ex. H at Baer41-43.

[94] Pl's Ex. G at Baer36-37.

[95] *Resolution Trust Corp. v. McKendry (In re McKendry)*, 40 F.3d 331, 336 (10th Cir. 1994). *See also Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (B.A.P. 10th Cir. 2016) (("Dischargeability actions require a two-part analysis: first, the bankruptcy court must determine the validity of the debt under applicable law (the claim on the debt); and second, the bankruptcy court must determine the dischargeability of that debt under § 523 (the dischargeability claim).").

[96] *McKendry*, 40 F.3d at 337.

[97] *Frank & Barbara Broyles Legacy Found. v. Nichols (In re Nichols)*, 509 B.R. 722, 727 (Bankr. N.D. Okla. 2014).

[98] *See* 11 U.S.C. § 502(b)(1): "[T]he court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that - (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

1. <u>Is the Unsigned Settlement Note Enforceable?</u>

Looking first at the Settlement Note, if it is a negotiable instrument, it must be signed to be enforceable. A "note" is defined in Utah Code Ann. § 70A-3-103(2)(w) by making reference to the definition of a "negotiable instrument" in Utah Code Ann. § 70A-3-104(1), which provides in relevant part that the note must contain "an unconditional promise or order to pay a fixed amount of money," upon demand or at a definite time, and be "payable to bearer or to order at the time it is issued."[99] The Settlement Note states that the Debtor "promises to pay to the order of" the Pioneer Street businesses "or to another person and at another place that the holder of this Note may designate."[100] Based on this language, the Court finds that the Settlement Note is a negotiable instrument under the UCC.

Utah's UCC provides that a "person is not liable on an instrument unless . . . the person signed the instrument."[101] Baer did not produce a signed copy of the Settlement Note. While the testimony and email evidence suggest the Debtor agreed to sign the Settlement Note, the Debtor is nonetheless not liable on the Settlement Note unless he actually signed it.[102] Therefore, the Court finds that Baer does not have a legally enforceable claim against the Debtor as of the petition date based on the unsigned Settlement Note.

2. <u>Did the Statute of Limitations Run on the Pioneer Street Fraud Claims Against the Debtor?</u>

However, Baer has a secondary theory for a monetary claim in bankruptcy based on allegations that the Debtor fraudulently represented the profitability of Pioneer Street and used

---

[99] *See also Carmichael v. Higginson,* 402 P.3d 146, 150 (Utah Ct. App. 2017) (explaining when a note constitutes a negotiable instrument).

[100] Pl's Ex. H at Baer41 (specifically the Settlement Note is payable to "Pioneer Street LLC, Pioneer Street Cab LLC, and Pioneer Street Properties LLC.").

[101] Utah Code Ann. § 70A-3-401(1)(a).

[102] *See Horman v. Gordon,* 740 P.2d 1346 (Utah Ct. App. 1987) (holding that a person who does not sign a note cannot be held liable thereon even if the parties had so intended, citing Utah Code Ann. § 70A-3-401(1)(a)).

Pioneer Street funds for personal loans and to pay for personal expenses. However, Baer never filed a state court complaint for fraud. Utah Code Ann. § 78B-2-305 provides a three-year limitation period "for relief on the ground of fraud or mistake; except that the cause of action does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake." A statute of limitations can bar a claim in bankruptcy: "the establishment of the debt itself [for purposes of § 523] . . . is governed by the state statute of limitations—if suit is not brought within the time period allotted under state law, the debt cannot be established."[103]

Thus, for Baer to have a monetary claim for fraud damages as of the petition date, he must have filed a state law complaint within three years of the discovery of the fraud. There is no dispute that in approximately April 2015, Baer discovered the Debtor's allegedly fraudulent representations regarding the profitability of Pioneer Street and the use of Pioneer Street funds to pay personal expenses. Consequently, the statute of limitations for a monetary fraud claim against the Debtor arising from the Pioneer Street business expired three years later in April 2018, which is many months prior to the petition date of February 4, 2019.

Because the alleged debts arising from Pioneer Street are not memorialized by a negotiable instrument signed by the Debtor, and because the statute of limitations for a fraud action has expired, Baer, as of the petition date, did not have an enforceable claim against the Debtor for the Pioneer Street debts. In other words, the debts relating to Pioneer Street were not "established" as of the petition date as required by *McKendry*. Baer could have avoided this outcome during the almost four years before the bankruptcy filing by either compelling the Debtor to sign the Settlement Note or by timely filing a fraud action in a Utah state court. Consequently, because

---

[103] *Resolution Trust Corp. v. McKendry (In re McKendry)*, 40 F.3d 331, 337 (10th Cir. 1994). *See also Frank & Barbara Broyles Legacy Found. v. Nichols (In re Nichols)*, 509 B.R. 722, 727 (Bankr. N.D. Okla. 2014) (holding that because state statute of limitations for fraud action had expired pre-petition, the creditor's "claim under § 523(a)(2)(A) must fail.").

there is no allowed claim for the amount of $55,660.46, Baer cannot seek to have such amount determined to be nondischargeable under § 523(a)(2). Therefore, the Court denies Baer's § 523(a)(2) cause of action for the amounts arising from Pioneer Street as asserted in the unsigned Settlement Note[104] and the list of alleged fraudulent expenses.[105] As an aside, it is unfortunate the Debtor did not pursue the statute of limitations defense as a dispositive motion as it would have limited the trial to the fraud allegations relating to the 2014 Notes.

### B.    Did the Debtor Engage in False Representations and Actual Fraud Under § 523(a)(2)(A) as to the 2014 Notes?

Baer argues the 2014 Notes are nondischargeable under § 523(a)(2)(A) because the Debtor fraudulently failed to disclose to Baer his 2010 bankruptcy filing, or because the Debtor engaged in a scheme from 2009 or 2011 through 2014 to defraud Baer.

To prevail on a nondischargeability action for misrepresentation under § 523(a)(2)(A), a plaintiff must establish the following: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the debtor's representation; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a proximate result.[106]

An assertion of actual fraud does not require a representation if the debtor nonetheless engaged in conduct involving moral turpitude, an intentional wrong, deception, or trickery that impairs a creditor's ability to collect the debt.[107]

---

[104] Pl's Ex. H.

[105] Pl's Ex. G.

[106] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996) (citing *Grogan*, 498 U.S. at 287), as modified by *Field v. Mans*, 516 U.S. 59, 70 (1995)).

[107] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 360 (2016).

A plaintiff's burden of proof is a preponderance of the evidence,[108] meaning each element must be established as being more likely than not.[109] In addition, "[e]xceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[110] For example:

> For a debt to be nondischargeable under § 523(a)(2)(A), there has to be more than just a loan that has gone unpaid. There has to be 'false pretenses, a false representation, or actual fraud' in the *making* of the loan, not just in acts subsequent to that time.[111]

Fraudulent intent requires a showing that the debtor knew his representation was false, knew that the representation may or may not be true, or knew that he lacked a factual basis to make the representation.[112] However, "[w]hile fraudulent intent may be inferred from the circumstances, any doubt [again] must be resolved in the debtor's favor."[113] As a result, a debtor's fraudulent scienter is often the most difficult element for a plaintiff to establish under § 523(a)(2).

Baer asserts that the 2014 Notes are nondischargeable because before he made the loans starting in 2011, the Debtor failed to voluntarily disclose his 2010 bankruptcy filing. There is no dispute that the Debtor did not disclose his 2010 bankruptcy filing to Baer until approximately

---

[108] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[109] *Barton Props., Inc. v. Blaskey (In re Blaskey)*, No. CC-14-1340-KuDKi, 2015 Bankr. LEXIS 627, at *11, 2015 WL 859601, at *4 (B.A.P. 9th Cir. Feb. 27, 2015) (citing *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 699, 701 (9th Cir. 2007); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997)).

[110] *Affordable Bail Bonds, Inc. v. Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[111] *Mote v. Giles (In re Giles)*, No. 20-5005, 2020 Bankr. LEXIS 2994, at *14, 2020 WL 6194590, at *5 (Bankr. D. Kan. Oct. 13, 2020) (emphasis in original).

[112] *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 175 (B.A.P. 10th Cir. 2012).

[113] *In re Giles*, 2020 Bankr. LEXIS 2994, at *13, *5, n.7.

2013 or 2014 and before the acquisition of the Pioneer Street businesses.[114] Baer testified that after

he learned of the bankruptcy filing, he did not recall asking any questions about it.[115]

> 1.   Is the Debtor's Nondisclosure of His Bankruptcy Filing an Oral Statement
> Respecting His Financial Condition Under § 523(a)(2)(A)?

First, the Court finds that a disclosure of a prior bankruptcy filing is in effect a statement

respecting a debtor's financial condition. As held by the Supreme Court:

> We also agreed that a statement is 'respecting' a debtor's financial condition [under
> § 523(a)(2)(B)] if it has a direct relation to or impact on the debtor's overall
> financial status . . . . [A financial statement] can help indicate whether a debtor is
> solvent or insolvent, able to repay a given debt or not. [116]

By its terms, § 523(a)(2)(A) does not apply to a debtor's oral statement of financial

condition, and written statements respecting a debtor's financial condition are only actionable

under § 523(a)(2)(B).[117] For purposes of this analysis, the Court views the Debtor's oral

nondisclosure of his bankruptcy case until 2013 or 2014 as the equivalent of the Debtor orally

representing to Baer that he had <u>not</u> filed for bankruptcy. But even if the Debtor had made such an

affirmative representation, such oral statement respecting his financial condition would not be

actionable under § 523(a)(2)(A). And because the Debtor did not publish a written statement to

Baer falsely stating he had not filed for bankruptcy, Baer cannot seek relief under § 523(a)(2)(B).

Thus, the Court finds that the Debtor's initial nondisclosure of his 2010 bankruptcy filing is not

actionable under § 523(a)(2).

---

[114] Trial Audio at 2:28:50, ECF no. 63.

[115] Trial Audio at 13:00, ECF no. 64.

[116] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).

[117] *See Field v. Mans*, 516 U.S. 59, 66 (1995) (holding that § 523(a)(2)(A) only applies "when the debt follows a
transfer of value or extension of credit induced by falsity or fraud (not going to [a debtor's] financial condition).").
*See also Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 704 (10th Cir. 2005) ("If a debt is obtained by a false <u>oral</u>
'statement respecting the debtor's . . . financial condition,' the debt <u>is</u> dischargeable.") (emphasis in original).

2. Was the Debtor's Nondisclosure of His Bankruptcy Filing Done with Fraudulent Intent?

Second, even if the nondisclosure of the bankruptcy was actionable, there was insufficient evidence for the Court to find that the nondisclosure was done with fraudulent intent. The testimony established that Baer never asked the Debtor about a bankruptcy filing, and that the Debtor voluntarily disclosed his bankruptcy filing to Baer during a casual discussion in 2013 or 2014.[118] Even after the disclosure, Baer did not ask any questions about it or review the details of the bankruptcy filing. Without more direct or circumstantial evidence or an intent or effort to conceal the bankruptcy filing, the Court cannot find it more likely than not that the Debtor acted with a fraudulent intent in not disclosing it to Baer prior to 2013 or 2014.

3. Did Baer Justifiably Rely on the Debtor's Nondisclosure of His Bankruptcy Filing?

Third, the evidence does not establish that Baer justifiably relied on the nondisclosure of the bankruptcy filing (i.e., Baer would not have loaned the money if he had known of the bankruptcy filing).

> In determining whether a creditor's reliance was justifiable, a court therefore examines the qualities and characteristics of the particular [creditor], and the circumstances of the particular case, rather than applying a community standard of conduct to all cases. Even under the justifiable test, however, the [creditor] must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it.[119]

The facts establish that even after the Debtor disclosed his bankruptcy filing, Baer agreed to partner with the Debtor in the Pioneer Street venture, to entrust the Debtor with the management of Pioneer Street, and to allow the Debtor to take profit distributions and loans from Pioneer Street. Indeed, during their conversation in 2013 or 2014 about the bankruptcy filing, the Debtor disclosed

---

[118] *Supra* note 119.

[119] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 786 (10th Cir. 2009) (quotations and citations omitted).

he had borrowed money from a woman in Las Vegas, and that he was trying to pay it back after his bankruptcy discharge. Baer testified that he thought this was "noble" of the Debtor.[120] This undercuts Baer's assertion that he would not have loaned money to the Debtor, as memorialized in the 2014 Notes, if he had known about the bankruptcy filing.

The Court therefore finds that the Debtor's failure to disclose his bankruptcy filing to Baer until later in their relationship is not actionable under § 523(a)(2)(A). Even if it was, the Court cannot find by a preponderance of the evidence that Baer justifiably or even actually relied on the Debtor's nondisclosure of his bankruptcy filing in making the loans memorialized in the 2014 Notes. In other words, the Court cannot find it more likely than not that Baer would not have made the loans had he known of the Debtor's bankruptcy filing at the beginning of their debtor/creditor relationship in 2011. For these reasons, the Court denies Baer's claim for relief under § 523(a)(2) based on the Debtor's failure to disclose his 2010 bankruptcy filing to Baer until 2013 or 2014.

### C.    Was the Quickbooks Statement Fraudulent Under § 523(a)(2)(B)?

Baer next argues that the 2014 Notes are nondischargeable because in 2011 the Debtor presented him with the 2008 Quickbooks Statement that was materially false. The Debtor asserts he also showed Baer his tax returns from his Las Vegas business, but Baer only remembers seeing the Quickbooks Statement.[121] An extension of credit based on a written statement necessitates the more rigorous standard of nondischargeability in § 523(a)(2)(B), which requires a materially false written statement respecting the Debtor's financial condition on which Baer reasonably relied and that the Debtor published with the intent to deceive.

---

[120] Trial Audio at 1:02:30, ECF no. 63.
[121] Trial Audio at 56:54, ECF no. 63.

1.    <u>Was the Quickbooks Statement Materially False?</u>

Baer asserts the 2008 Quickbooks Statement showing a profit of $250,000 from the Debtor's Las Vegas financial planning business was materially false because the Debtor's Statement of Financial Affairs from his 2010 bankruptcy filing only listed gross income of $144,167 for 2008. The Debtor explained that the income listed on his bankruptcy papers came from his joint tax returns, which included his wife's business losses, and that he provided this tax return to his attorney who prepared the bankruptcy papers. The Debtor also stated that the Quickbooks Statement was provided to the IRS in connection with an audit, from which he received a refund, and that this attests to its accuracy. There was no evidence rebutting these assertions. The Debtor further explained there was a difference between the profits from his Las Vegas business and his personal income.

Baer stated he did not understand how the Debtor could have made a profit of $250,000 in 2008 and then file for bankruptcy in 2010. Yet the Debtor explained that after his first divorce, his ex-spouse filed for bankruptcy leaving him with sole liability for more than $1 million in community property debts. This, along with his move from Las Vegas and his new domestic support obligations from the divorce, caused the Debtor to file for bankruptcy in 2010.

Neither the Quickbooks Statement nor the tax returns for the Debtor or Perpetual Wealth are in evidence. This leaves the Court without the necessary proof to conclusively determine if the Quickbooks Statement was false—let alone materially false. And as noted above, any doubt must be resolved in the Debtor's favor. Consequently, without more specific evidence, the Court cannot find it more likely than not that the Quickbooks Statement was materially false.

2.    <u>Did Baer Reasonably Rely on the Quickbooks Statement?</u>

Even if the Debtor's Quickbooks Statement was materially false, the Court cannot find that Baer met the higher standard of reasonable reliance required under § 523(a)(2)(B). A

determination of Baer's reliance is measured by an objective standard.[122] Baer must not only show actual reliance, but that his reliance was reasonable.[123] "The standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon debtor's representations."[124] "Because a creditor has the responsibility to ensure there is some basis to rely on a debtor's representation, a debtor's representation, by itself, can not be the basis for a creditor's reasonable reliance."[125]

Turning to the facts, Baer testified that he did not seek additional verification of the financial information in the 2008 Quickbooks Statement, and he did not ask for additional documents respecting the Debtor's financial condition, such as tax returns or profit and loss statements from other years. While Baer is a psychologist, he testified about two prior partnerships. In each case, Baer likewise had his partner manage the business without his constant supervision. One business was successful, but the other involved a partner who had "robbed him blind" by likewise paying personal expenses with business funds.[126] In light of Baer's prior fraudulent experience with a partner, the Court cannot find that it was reasonable for Baer to not have done at least some due diligence to substantiate the Debtor's claims of profitability before loaning him hundreds of thousands of dollars.

Baer's reasonable reliance is further belied by the fact that even after learning of the Debtor's bankruptcy filing, and even after the failure of Perpetual Wealth to generate profit

---

[122] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 713 (10th Cir. 2005) (quoting *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 503 (Bankr. S.D.N.Y. 1999)), *abrogated on other grounds by Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752 (2018).

[123] *McClave State Bank v. Stum (In re Stum)*, Nos. CO-20-055, CO-20-059, 2021 Bankr. LEXIS 3284 at *17, 2021 WL 5630342 at *8, (B.A.P. 10th Cir. Dec. 1, 2021).

[124] *Id.* at *19 (citing *Leadership Bank, N.A. v. Watson (In re Watson)*, 958 F.2d 977, 978 (10th Cir. 1992)).

[125] *In re Dehlin*, Nos. 09-20955, 09-2176, 2011 Bankr. LEXIS 1142, at *19, 2011 WL 1261623, at *6 (Bankr. D. Utah Mar. 31, 2011).

[126] Trial Audio at 3:22:47, ECF no. 63.

distributions, Baer continued to entrust the Debtor with management of the Pioneer Street venture and allowed him to take personal loans from it. For these reasons, the Court cannot find that Baer reasonably relied on the Quickbooks Statement as required by § 523(a)(2)(B).

3.   Did the Debtor Publish the Quickbooks Statement with the Intent to Deceive?

Even if Baer's reliance was reasonable, the Court cannot find from direct or circumstantial evidence that at the time of the Perpetual Wealth loans, the Debtor published the Quickbooks Statement with the intent to deceive. The Debtor testified that from November 2011 through May 2012, Baer had loaned $98,000 that the Debtor fully repaid. There was no evidence rebutting this testimony. And each of the 2014 Notes contain the hand-written notation that "[t]his note replaces any and all prior notes between the parties," which corroborates the Debtor's assertion of prior notes between the parties. After May 2012, Baer continued to loan funds, and the Debtor later signed the 2014 Notes memorializing the total, unpaid loans at $241,542. The Debtor subsequently made ten monthly payments on the notes totaling $17,294.86. The Debtor stopped paying on the 2014 Notes after he was fired by Baer in April 2015. The Debtor's payments on the 2014 Notes until he was fired suggests he did not have a fraudulent intent at the time he signed them in June 2014.

There was no dispute that Perpetual Wealth never generated any profits, let alone profits on par with those asserted in the Quickbooks Statement. However, neither was there a dispute between the parties that poor market conditions, coupled with the Debtor's divorce from his first wife and the developing marital problems with his second wife, impeded the success of Perpetual Wealth. The fact that Perpetual Wealth was not successful does not, without more, establish that the Debtor intended to cheat Baer or deprive him of repayment on the loans. Further, the Debtor's explanations for the difference between the amounts listed in the Quickbooks Statement and his

bankruptcy papers, as discussed above, are sufficiently plausible to cast doubt on the allegation that he intended the Quickbooks Statement to deceive and defraud Baer.

It is true that after Baer fired the Debtor, he admitted in an email that he borrowed money so he could stay at home to focus on his failing marriage and to maintain a "standard of living far better than it should have been." The Debtor also states, "I know I am an honest man, but yet, I haven't been." The Debtor explained this statement to mean that he could not say he was honest because he had too much debt he could not repay.[127] The Court finds this admission to be insufficiently clear as to constitute direct or circumstantial evidence of a fraudulent intent. As noted above, an inability to pay debts, without more, is not evidence of fraud. It is also not clear whether the statement of not being an honest man relates to the 2014 Notes or to the Pioneer Street debts, which the Court has ruled to be non-actionable.

The Debtor further acknowledges that his "arrogance, fear, ignorance and greed" destroyed his business relationship with Baer. The Debtor then makes general statements about ruining things, letting Baer down, not being a good partner, etc. While these are admissions of character failings, the Court finds they lack sufficient specificity to constitute an admission of fraudulent intent at the time Baer loaned the funds memorialized in the 2014 Notes.

Consequently, without more direct or circumstantial evidence of the Debtor's deceit or fraudulent intent at the time of Baer's loans, the Court cannot find that it is more likely than not that the Debtor did not repay the loans stated in the 2014 Notes because he was dishonest about his business savvy and prior profitability or that he intended to defraud Baer. Given that the Debtor's explanations as to why Perpetual Wealth was not as successful as the parties wished, the Court must give the Debtor the benefit of doubt as to whether he acted with fraudulent intent.

---

[127] *Supra* note 93.

## V.    CONCLUSION

For the reasons set forth above, the Court finds that the Baer's debt claim under the Settlement Note was unenforceable on the petition date because it was not signed, and that his cause of action for fraud damages in connection with the Pioneer Street venture was likewise unenforceable due to the expiration of the applicable statute of limitations before the petition date.

As to the 2014 Notes, the Court finds that Baer has not established by a preponderance of the evidence that the Debtor made false representations, false pretenses, or engaged in actual fraud under § 523(a)(2)(A). The Court likewise finds that Baer has not established by a preponderance of the evidence that the Quickbooks Statement was materially false, that Baer actually or reasonably relied on it, or that the Debtor published it with a fraudulent intent as required by § 523(a)(2)(B).

As argued by the Debtor in closing, Baer must have first carried his burden of proof before the Debtor was required to prove that the Quickbooks Statement was accurate or that the belated disclosure of the bankruptcy filing was done with the intent to defraud. While Baer established some questionable conduct by the Debtor, such was not more likely than not to be fraudulent, and any question of doubt must be resolved in the Debtor's favor.

Based on the foregoing, the Court finds that Baer did not carry his burden of proof by a preponderance of the evidence that his monetary claims against the Debtor should be nondischargable under §523(a)(2). The Court will issue an order simultaneously with this Memorandum Decision.



## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing MEMORANDUM DECISION DENYING PLAINTIFF'S CAUSES OF ACTION UNDER 11 U.S.C. § 523(a)(2) shall be served to the parties and in the manner designated below.

By Electronic Service: I certify that the parties of record in this case as identified below, are registered CM/ECF users:

      Paul H. Gosnell  Paul@CRC.Law
      Steven M. Rogers  srogers@roruss.com
      United States Trustee  USTPRegion19.SK.ECF@usdoj.gov
      Michael F. Thomson, Tr  thomsonm@gtlaw.com

By U.S. Mail: In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

      Geoffrey Wayne Myers
      4900 S 4380 W Kearns,
      UT 84118

      Richard Baer
      1430 Canyon Road, Apt. 2
      Logan, UT 84321-4395